# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v HAMMERLUND

Docket No. 156901. Argued on application for leave to appeal April 24, 2019. Decided July 23, 2019.

Jennifer M. Hammerlund was charged in the Kent Circuit Court with operating while intoxicated, third offense, MCL 257.625; and failing to report an accident resulting in damage to fixtures, MCL 257.621, for her involvement in a single-vehicle accident that she did not report to the police. Her abandoned vehicle was discovered by Officer Erich Staman of the Wyoming Police Department, who searched the vehicle, found that it was registered to defendant, and went to her home. According to Staman, he stood on her porch while she remained inside, approximately 15 to 20 feet away from the front door, and they had a short conversation during which defendant admitted to driving the car that caused the damage. When Staman asked defendant to produce her identification, she passed a card to him through a third party in the home. After verifying her information, Staman offered the identification card back to defendant. According to Staman, when defendant came to the door and reached out to take the card, he grabbed her by the arm and attempted to take her into custody for having failed to report her accident. Staman stated that when defendant pulled away, the momentum took him inside the home, where he handcuffed defendant and completed the arrest before taking her to jail. Breath tests administered at the jail indicated that defendant had a blood alcohol content over the legal limit. Defendant filed a pretrial motion to suppress evidence and dismiss the charges, arguing that Officer Staman had violated her Fourth Amendment rights by arresting her inside her home without a warrant and that the evidence gathered following the arrest was subject to the exclusionary rule. The trial court, Paul J. Sullivan, J., denied the motion, ruling that the arrest was constitutionally valid because defendant had voluntarily reached out of her open doorway, which was a public place for Fourth Amendment purposes under *United States v Santana*, 427 US 38 (1976). After a jury trial, defendant was convicted as charged, and she was sentenced to five years' probation and four months in jail for having violated MCL 257.625 and to a concurrent term of 60 days in jail for having violated MCL 257.621. Defendant appealed, challenging the trial court's denial of her motion to suppress evidence. The Court of Appeals, MURRAY, P.J., and SAWYER and MARKEY, JJ., affirmed, holding that the arrest was constitutional under *Santana* and that the trial court had not erred by denying defendant's motion. *People v Hammerlund*, unpublished per curiam opinion of the Court of Appeals, issued October 17, 2017 (Docket No. 333827). Defendant sought leave to appeal in the Supreme Court, which ordered and heard oral argument on whether to grant the application or take other action. 501 Mich 1086 (2018).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices VIVIANO, BERNSTEIN, and CLEMENT, the Supreme Court, in lieu of granting leave to appeal, *held*:

Defendant was not subject to public arrest because she remained inside her home, where she maintained her reasonable expectation of privacy. Defendant's act of reaching out to retrieve her identification card did not expose her to the public as if she had been standing completely outside her house under *Santana*, and the circumstances were insufficient to justify the hot-pursuit exception to the warrant requirement. Because the arrest was completed across the Fourth Amendment's firm line at the entrance of the home, it was presumptively unreasonable, and the prosecution failed to overcome this presumption. The Court of Appeals judgment was reversed and the case was remanded to the trial court to consider whether evidence should be suppressed under the exclusionary rule.

1. The Fourth Amendment of the United States Constitution provides that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. In order to be reasonable, an arrest must be justified by probable cause to believe that an offense has been or is being committed. Even when based on probable cause, however, a warrantless search or seizure inside a suspect's home is presumptively unreasonable, absent exigent circumstances. Warrantless arrests that take place in public upon probable cause do not violate the Fourth Amendment.

2. The officer had probable cause to arrest defendant for failing to report an accident that caused damage to fixtures under MCL 257.621(a), which is a misdemeanor. While probable cause alone may justify a warrantless public arrest, the same is not true when it comes to arresting a suspect in the suspect's home. Under *Payton v New York*, 445 US 573 (1980), an officer must obtain a warrant or identify exigent circumstances that excuse the warrant requirement before entering a home to make an arrest. In this case, there was no dispute that defendant's arrest was completed inside her home. The lower courts erred by relying on *Santana* to conclude that defendant's Fourth Amendment rights remained intact because—unlike the defendant in *Santana*, who was standing in her open doorway when officers arrived—defendant was not "exposed to public view, speech, hearing, and touch, as if she had been standing completely outside her house." Defendant was never in a public place, and she possessed a reasonable expectation of privacy inside her home that she maintained throughout the encounter. It was unnecessary to determine how far defendant extended her arm or hand over the threshold because a Fourth Amendment analysis does not focus on such arbitrary calculations; the focus remains on determining whether a person sought to preserve his or her reasonable expectation of privacy. Defendant did not surrender her reasonable expectation of privacy when some portion of her hand or arm crossed the threshold to retrieve her property. Instead, her actions manifested an intent to stay inside, and Staman was aware of that intent. Defendant's expectation of privacy within her home was reasonable, and her action of reaching out over the threshold and retrieving her identification did not relinquish that reasonable expectation.

3. When officers have probable cause and exigent circumstances exist, it is reasonable under the Fourth Amendment for officers to enter a home without a warrant. Exigent

circumstances exist when an emergency leaves law enforcement with insufficient time to obtain a warrant. While hot pursuit of a fleeing felon is one recognized example of exigent circumstances, there was a not a legitimate hot pursuit in this case. It is unclear whether an officer with probable cause to arrest a suspect for a misdemeanor may rely on the hot-pursuit exception to make a warrantless home entry, and there was no suggestion of any emergency that would have entitled the police to enter defendant's home throughout the conversation up to the point when defendant reached out to retrieve her identification. Accordingly, the seizure in this case, which occurred beyond the "firm line at the entrance of the house," was prohibited under *Payton* because it was accomplished without a warrant, without consent, and without any exigent circumstances.

Court of Appeals judgment reversed; case remanded for further proceedings.

Justice ZAHRA, joined by Justice MARKMAN, dissenting, would have held that *Santana* was on point, applicable, and not meaningfully distinguishable from the facts presented in this case, given its holding that the doorway of one's residence is considered a public space for purposes of Fourth Amendment analyses. He stated that under *Santana*, when the arrest was initiated after some part of defendant's person had extended beyond the constitutionally protected bounds of her home, defendant was "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." He also stated that because the arrest was supported by probable cause, initiated in a public place in accordance with *Santana*, and properly completed inside defendant's home under the hot-pursuit exception to the warrant requirement, he would have affirmed defendant's convictions. He further reasoned that if the warrantless entry into defendant's home and subsequent arrest were improper, the established facts were sufficient to hold that exclusion of the evidence obtained after the arrest would not be appropriate under the United States Supreme Court's decision in *New York v Harris*, 495 US 14 (1990). Thus, he would have decided this issue in the name of judicial efficiency.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 23, 2019

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                         No. 156901

JENNIFER MARIE HAMMERLUND,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

In this case we must decide whether defendant's constitutional right to be free from unreasonable seizures was violated when a police officer entered her home to complete her arrest for a misdemeanor offense. The Court of Appeals concluded that defendant exposed herself to public arrest when she reached out her doorway to retrieve her identification and that when she pulled her arm back into her home the officer's entry was lawful as a "hot pursuit." We disagree. Defendant did not surrender her Fourth Amendment rights when she interacted with law enforcement at her doorway because she consistently maintained

her reasonable expectation of privacy throughout the encounter, and further, the entry was not justified under the "hot pursuit" exception to the warrant requirement. The warrantless arrest was unreasonable under *Payton v New York*, 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980). We reverse the Court of Appeals judgment and remand this case to the trial court for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

Defendant, Jennifer Marie Hammerlund, was involved in a single-vehicle accident in the early morning hours of September 30, 2015, on a highway exit ramp in Wyoming, Michigan. According to defendant, another driver cut her off, causing her to overcorrect and lose control of her car. Her vehicle scraped a cement barrier and left a dent on a metal guardrail. Defendant suffered only minor injuries; however, the car was no longer drivable. She attempted to call her insurance company and then used a rideshare service to get home. She did not report the accident to police.

Soon after, Officer Erich Staman of the Wyoming Police Department was dispatched to the scene of a reported abandoned vehicle on the shoulder of the highway off-ramp. After observing the damage to the vehicle, as well as the guardrail and cement barrier, Officer Staman requested a tow truck and conducted an inventory search. He discovered that the vehicle was registered to defendant and that it contained paperwork bearing defendant's name, so he requested that officers from the Kentwood Police Department go to defendant's home to perform a welfare check.

In the meantime, according to defendant, she returned home, found that she was "really shaken up," and drank some alcohol. She then went into her room and went to bed.

2

Only a few minutes later, the Kentwood officers arrived and told her roommate that they wished to speak with defendant. Defendant initially declined to leave her room; however, after her roommate spoke to the officers and reported back to defendant that the police would take her into custody and arrest the roommate for harboring a fugitive if she did not appear, defendant came to the door. After that, Officer Staman arrived at the home to "make contact" with defendant.

Officer Staman testified that when he arrived at defendant's home, he stood on her porch while she remained inside, approximately 15 to 20 feet away from the front door. He acknowledged that it "didn't appear that [defendant] wanted to come to the door . . . ." And, when asked whether defendant "made it pretty clear that she wasn't coming out of the home," he agreed, stating, "It seemed that she wasn't going to come out." During their short conversation, defendant admitted to driving the car that caused the damage. When he asked defendant to produce her identification she was "reluctant" to give it to him so she passed it to him through a third party in the home. Officer Staman testified that defendant told him that she "thought [Officer Staman] might be trying to coax her out of the house."

After verifying her information, Officer Staman offered the identification card back to defendant. He explained:

> And then I had to give the I.D. back to her, so I made sure I gave it back to Ms. Hammerlund. In doing that she came to the door where I was standing and reached out to get the I.D. as I gave it back to her, at which point I grabbed her by the arm and attempted to take her into custody . . . [f]or the hit and run that she just admitted to.

3

He said that when defendant pulled away he grabbed her again and "the momentum" took him inside the home two to three steps where he handcuffed defendant and completed the arrest.

Following the arrest, Officer Staman placed defendant into the back of his patrol car. After she was advised of and waived her *Miranda*[1] rights, defendant provided further details about the crash, which she described to the officer as possibly a "road rage situation." Officer Staman detected a smell of intoxicants that was "moderate at best" and asked defendant if alcohol played a role in the crash. She opined that it had not, but did acknowledge drinking alcohol earlier in the night after finishing her shift as a bartender and later indicated that she thought her blood alcohol level may have been over the legal limit. When asked if she had any alcohol to drink *after* the accident, defendant replied, "Absolutely not." Once transported to the county jail, defendant was given two successive breath tests, which indicated a blood alcohol content over the legal limit at .22 and .21, respectively. Consequently, defendant was charged with operating while intoxicated (OWI), third offense, MCL 257.625, and failing to report an accident resulting in damage to fixtures, MCL 257.621.

Defendant filed a pretrial motion to suppress evidence and dismiss the charges. In the motion, she argued that Officer Staman had violated her Fourth Amendment rights by arresting her inside her home without a warrant and that all the evidence gathered following that arrest was subject to the exclusionary rule. The trial court denied the suppression motion, concluding that the arrest was constitutionally valid pursuant to *United States v*

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

4

*Santana*, 427 US 38; 96 S Ct 2406; 49 L Ed 2d 300 (1976). Specifically, it found that defendant was "in the middle of a consensual discussion with Officer Staman" when she "voluntarily approached him" and "voluntarily reached out of her door." Therefore, the court concluded that Officer Staman "was legitimately in that area and it did not violate the constitution for him to effectuate an arrest by grabbing her arm when she reached out of her doorway." The fact that the officer stepped inside defendant's home to complete the arrest did not change the result, according to the trial court, because the officer was "clearly in pursuit for the arrest at that point . . . ."

The case proceeded to trial. Defendant's theory of the case was that she became intoxicated only after the accident. However, she acknowledged that she did not tell any of the officers that she drank when she got home. Defendant's statements made to Officer Staman in his patrol car, as well as her blood-alcohol-content test results, were admitted at trial. After a jury trial, defendant was convicted as charged, and she was sentenced to five years' probation and four months in jail for violating MCL 257.625 and to a concurrent term of 60 days in jail for violating MCL 257.621.

Defendant appealed, continuing to challenge the trial court's denial of her motion to suppress. The Court of Appeals, like the trial court, concluded that the arrest was constitutional under *Santana*, 427 US at 42, and that the trial court had not erred by denying defendant's motion. *People v Hammerlund*, unpublished per curiam opinion of the Court of Appeals, issued October 17, 2017 (Docket No. 333827). Defendant sought leave to appeal in this Court, and we ordered oral argument on the application.[2]

---

[2] In our order, we directed the parties to address "whether it is constitutionally permissible

5

## II.  STANDARD OF REVIEW

We review a trial court's findings of fact at a suppression hearing for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005).  We examine the facts as they were presented to the trial court at the time of the suppression hearing, not as supplemented by evidence presented at trial.  *People v Kaigler*, 368 Mich 281, 288; 118 NW2d 406 (1962).  Our review of the trial court's application of Fourth Amendment principles, however, is de novo.  *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011).

## III.  LEGAL BACKGROUND

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.  [US Const, Am IV.][3]

---

for a police officer to compel, coerce, or otherwise entice a person located in his or her home to enter a public place to perform a warrantless arrest." *People v Hammerlund*, 501 Mich 1086, 1087 (2018).  After receiving the benefit of briefing and oral argument, we find it improvident to consider this issue because the facts of this case do not lead to the conclusion that defendant subjected herself to a public arrest.  That our order directed the parties to address the issue of constructive entry—which the dissent agrees need not be decided under the facts of this case—does not mean that we are imprudently or incorrectly deciding the very legal issues decided by the trial court and the Court of Appeals and briefed by the parties on appeal to this Court.

[3] The Michigan Constitution, Const 1963, art 1, § 11, provides coextensive protection to that of its federal counterpart.  See *People v Mead*, 503 Mich ___; ___ NW2d ___ (2019) (Docket No. 156376); slip op at 5.

The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v Stuart*, 547 US 398, 403; 126 S Ct 1943; 164 L Ed 2d 650 (2006); see also *People v Mead*, 503 Mich ___; ___ NW2d ___ (2019) (Docket No. 156376); slip op at 5 ("The Fourth Amendment demands nothing more or less than reasonableness."). In order to be reasonable, an arrest must be justified by probable cause. *Dunaway v New York*, 442 US 200, 208; 99 S Ct 2248; 60 L Ed 2d 824 (1979). "Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v Champion*, 452 Mich 92, 115; 549 NW2d 849 (1996).

Even when based on probable cause, however, a warrantless search or seizure inside a suspect's home is presumptively unreasonable. *Payton*, 445 US at 586. In fact, the United States Supreme Court has recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id*. at 585 (quotation marks and citations omitted). To protect against unreasonable intrusions into the home, a warrant is required to "interpose the magistrate's determination of probable cause between the zealous officer and the citizen." *Id*. at 602. In other words, "the Fourth Amendment has drawn a firm line at the entrance to the house," which "[a]bsent exigent circumstances . . . may not be reasonably crossed without a warrant." *Id*. at 590; see also *Kirk v Louisiana*, 536 US 635, 638; 122 S Ct 2458; 153 L Ed 2d 599 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). The burden of overcoming

7

the presumption of unreasonableness attached to a warrantless entry rests on the prosecution. *People v Oliver*, 417 Mich 366, 380; 338 NW2d 167 (1983).

Warrantless arrests that take place in public upon probable cause do not violate the Fourth Amendment. *United States v Watson*, 423 US 411, 423-424; 96 S Ct 820; 46 L Ed 2d 598 (1976). In Michigan, this standard applies when probable cause exists for a misdemeanor. See *People v Hamilton*, 465 Mich 526, 533; 638 NW2d 92 (2002) ("[P]robable cause to arrest for a *felony* is not required; rather, probable cause that a crime (felony or misdemeanor) has been committed is the constitutional requirement for an arrest."), overruled in part on other grounds by *Bright v Ailshie*, 465 Mich 770 (2002).

## IV. ANALYSIS

As noted, the Fourth Amendment permits an arrest without a warrant in a public place as long as the police officer making the arrest possesses sufficient probable cause. *Watson*, 423 US at 423. The officer in this case had probable cause to arrest defendant for failing to report an accident that caused damage to fixtures. MCL 257.621(a). He personally observed damage to the guardrail and cement barrier near defendant's abandoned vehicle. Further, defendant admitted to him that she was driving the car that caused the damage and that she did not report the accident to law enforcement. This

information was more than adequate to provide the officer with probable cause to believe

that the misdemeanor offense had been committed.[4]  Defendant does not argue otherwise.[5]

---

[4] We take this opportunity to note that failure to report an accident resulting in damage to fixtures is a 90-day misdemeanor.  Under Michigan law, therefore, Officer Staman was not statutorily authorized to arrest defendant.  See MCL 764.15(1)(d) (A peace officer may make a warrantless arrest where "[t]he peace officer has reasonable cause to believe a misdemeanor punishable by imprisonment for more than 92 days or a felony has been committed and reasonable cause to believe the person committed it.").  However, a statutory violation and a constitutional violation are not one and the same.  See *Hamilton*, 465 Mich at 534 ("A number of decisions establish that statutory violations do not render police actions unconstitutional.").

[5] The dissent concludes that Officer Staman also possessed probable cause to arrest defendant for OWI-3d because he observed that defendant was "leaning against a wall as if to maintain balance," "that her speech was slurred prior to transporting her to the police station," and that she had previous OWI convictions.  There are multiple problems with this conclusion.  First, that defendant was slurring her speech and unstable on her feet could possibly provide probable cause to believe that she was under the influence when the crash occurred; however, considering the fact that defendant was in an accident in which her head collided with a steering wheel and the intervening time between the accident and the police contact, without more concrete facts it is a stretch to conclude that any unsteadiness or warped speech stemmed from intoxication that was present at the time she operated the vehicle.  Second, the record is vague about when exactly Officer Staman noticed defendant slurring her speech, and it is unclear whether it was while she remained inside her home or only after she was arrested.  Third, relatedly, there is nothing in the record to indicate that Officer Staman was aware of defendant's prior OWI convictions before he made the arrest.  The dissent speculates that Officer Staman "may well have been aware of" the prior convictions, but cites nothing in the record that supports such a statement other than the fact that OWI convictions are reported to the secretary of state under MCL 257.625(21)(a).

Further, what Officer Staman observed or discovered *after* the arrest is not relevant to whether the officer had probable cause to arrest in the first place.  Probable cause to arrest exists where the facts and circumstances *known* to the officer would warrant a person of reasonable caution to believe that the offense was committed by the suspect.  *Champion*, 452 Mich at 115.  The dissent's reliance on *Devenpeck v Alford*, 543 US 146; 125 S Ct 588; 160 L Ed 2d 537 (2004), is misplaced.  *Devenpeck*, as the dissent acknowledges, states that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the *known* facts provide probable cause."  *Id*. at 153.  As we have discussed,

9

While probable cause alone may justify a warrantless public arrest, the same is not true when it comes to arresting a suspect in her home. Under *Payton*, law enforcement must obtain a warrant or identify exigent circumstances that excuse the warrant requirement before entering a home to make an arrest. *Payton*, 445 US at 590. In this case, there is no dispute that Officer Staman completed defendant's arrest inside her home. Instead of viewing this as a straightforward *Payton* violation, the lower courts relied on *Santana* to find that defendant's Fourth Amendment rights remained intact because of her own actions before the arrest.

In *Santana*, undercover officers who had probable cause to believe the defendant had just been involved in an illegal purchase of heroin drove to the defendant's house and saw her standing in the doorway holding a brown paper bag. *Santana*, 427 US at 40. According to one officer, the defendant was "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Id*. at n 1. The officers pulled up within 15 feet of the defendant and got out of the vehicle while shouting "police" and displaying their identification. *Id*. at 40. The defendant retreated into her home, and the officers followed her inside and arrested her, discovering drugs in the bag and marked money on her person. *Id*. at 40-41. Before trial, the defendant successfully moved to suppress the evidence after the trial court ruled

the facts that were *known* to Officer Staman at the time of the arrest were not sufficient to establish probable cause for OWI or any other identified felony. The dissent's position would allow the police to retroactively manufacture probable cause where none existed at the time the arrest was made. Most important, however, is that even if we were to conclude that the officer possessed probable cause to arrest defendant for OWI, it would not render this a constitutional arrest because there was no legitimate hot pursuit.

10

that a warrant was necessary to enter her home.  *Id*.  The United States Supreme Court reversed, concluding that (1) the arrest began in a public place, and (2) the police were in lawful hot pursuit when they entered the defendant's home because there was a realistic expectation that she would destroy the evidence.  *Id*. at 43.  Therefore, the arrest was constitutional because "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."  *Id*.

## A.  PUBLIC ARREST

In our view, *Santana* is distinguishable from the instant case.  Unlike the defendant in *Santana*, in this case defendant was not "exposed to public view, speech, hearing, and touch, as if she had been standing completely outside her house."  *Id*. at 42.  Defendant was never in a public place and possessed a reasonable expectation of privacy inside her home that she maintained throughout the encounter.  The lower courts erred by holding otherwise.

Initially, we do not agree with the Court of Appeals' conclusion that defendant "went further" than the *Santana* defendant to expose herself to the public by approaching the doorway and "extending her arm beyond the threshold" to retrieve her identification.  *Hammerlund*, unpub op at 5.  The *Santana* defendant stood squarely in the middle of her doorway.  Here, the circuit court found only that defendant "reached out of her door" to retrieve her property.  According to the record, all that breached the threshold was some portion of defendant's arm or hand.[6]

---

[6] Testimony concerning how far defendant reached out or how much—if any—of her body was exposed to the public is ambiguous at best.  When asked if he went inside to grab her

11

But the fact that some portion of defendant's arm or hand crossed the threshold does not tell us the constitutional significance of this fact. Should we consider her to be in public if her whole arm was outside the threshold? What if it was only her wrist or a couple of her fingers? Fortunately, an attempt to determine how far defendant extended her arm or hand over the threshold and what that might mean is an unnecessary exercise.[7] Our Fourth Amendment analysis does not focus on such arbitrary calculations; our focus remains on determining whether a person sought to preserve her constitutionally protected reasonable expectation of privacy. See *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967).

It is beyond clear that defendant had a reasonable constitutional expectation of privacy within her home. *Payton*, 445 US at 587 ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.") (quotation marks and citation omitted). Answering a knock at the door or speaking with

---

arm, Officer Staman replied, "I stood on the outside of the porch when I initially grabbed it, and she had pulled away, which caused me to have to grab it again . . . ." On cross-examination, he stated: "I reached out to give her the I.D., and she reached out to grab it from me. That's when I grabbed ahold of her wrist." When asked where the "grab" took place, Officer Staman said, "I waited until her hand reached out to mine, so I didn't reach in to give it to her, I just held it out and she reached out to grab it from me." He testified that he did not think his hand "was ever inside the house . . . ." While the officer's testimony does not illuminate how far defendant reached out to retrieve her identification, we cannot say that the trial court's finding that defendant "reached out of her door" was clearly erroneous. *People v Custer*, 465 Mich 319, 325; 630 NW2d 870 (2001).

[7] See *Sparing v Village of Olympia Fields*, 266 F3d 684, 689 (CA 7, 2001) ("Splitting fractions of an inch can be a very treacherous endeavor, producing arbitrary results. But we need not pull out our rulers and begin to measure. Under the Fourth Amendment, the point must be identified by inquiry into reasonable expectations of privacy.").

officers does not destroy an occupant's right to maintain a reasonable expectation of privacy from unreasonable intrusion. *Kentucky v King*, 563 US 452, 470; 131 S Ct 1849; 179 L Ed 2d 865 (2011) ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").[8]  The only question is whether defendant's expectation of privacy remained intact when some portion of her hand or arm crossed the threshold to retrieve her property or if, by doing so, she somehow surrendered that expectation.

The lower courts compared this case to *Santana* to conclude that defendant did not have a reasonable expectation of privacy because she exposed herself to public arrest.  See *Hammerlund*, unpub op at 5.  *Santana* is distinguishable.  In that case, the defendant was voluntarily standing in the middle of her open doorway before the police encounter even began; by doing so, she exposed herself to the public "as if she had been standing completely outside" and she did not have *any* reasonable expectation of privacy from the very beginning of the encounter.  *Santana*, 427 US at 42.  In contrast, defendant began this encounter inside her home—inside her bedroom—emerging only when she and her

---

[8] The lower courts did not conclude that defendant exposed herself to public arrest by coming to the door or by talking to Officer Staman while standing 15 to 20 feet back from the door.  Rather, the lower courts concluded that defendant subjected herself to public arrest only by extending her hand beyond the threshold when retrieving her identification.  See *Hammerlund*, unpub op at 5 ("[D]efendant's act of reaching out to grab her identification . . . caused her to . . . expos[e] herself to a public arrest . . . .").  Accordingly, we need not decide whether her mere presence and interaction with Officer Staman at the door, and whether she did so voluntarily or as a result of coercion or deception, constituted exposure to public arrest.

roommate were threatened with arrest, and then remaining 15 to 20 feet away from the doorway. When asked to provide her driver's license, she had her roommate pass it to Officer Staman while she remained away from the door. Defendant manifested an intent to stay inside, and Officer Staman was aware of that intention. Given her actions, she did not voluntarily and knowingly expose herself to the public as if she had been standing outside her house. Defendant's actions made clear that she was carefully preserving her expectation of privacy.

Nonetheless, the Court of Appeals affirmed the trial court's application of *Santana* to this case because it reasoned that defendant exposed herself to public arrest by approaching the door and reaching out to retrieve her identification. *Hammerlund*, unpub op at 5. But there is a fundamental difference between the reasonable expectation of privacy of a person who voluntarily stands in an open doorway and the reasonable expectation of privacy of a person who remains inside the confines of her home, approaching the doorway only briefly and momentarily breaking the plane of the doorway with some portion of her arm or hand.[9] In other words, defendant did not surrender her

---

[9] See *United States v Flowers*, 336 F3d 1222, 1227 (CA 10, 2003), holding that the defendant was not subject to public arrest under *Payton* and *Kirk* and distinguishing *Santana*:

> The record shows that at the time of Flowers' arrest, and from the time that night at which the police officers first came to Flowers, Flowers was inside his home. Although Flowers put his arm and hand outside his house by extending them through the panel opening, the rest of his body did not cross his threshold. We believe that Flowers did not lose "the constitutional protection afforded to the individual's interest in the privacy of his own home," *Payton*, [445 US at 588,] by this limited exposure. Rather, Flowers

14

expectation of privacy because she did not expose herself to public view, speech, hearing, and touch *as if she had been standing completely outside*. *Santana*, 427 US at 42.

Defendant manifested an intent to remain fully within her home by carefully standing several feet away from the door. She continued to manifest this intent when she approached the doorway briefly and only broke the plane of the doorway with some portion of her arm or hand. We think that society would recognize defendant's behavior as preserving a reasonable expectation of privacy. In fact, we would venture that what society would *not* view as reasonable is exactly what occurred in this case—that a person suspected of a minor misdemeanor could be subjected to a warrantless arrest inside her home in the middle of the night.

To recap, defendant's expectation of privacy within her home was reasonable, and her action of reaching out over the threshold and retrieving her identification did not relinquish that reasonable expectation. Defendant was not exposed to public arrest, and accordingly, *Santana* is inapplicable to the facts of this case.

## B. EXIGENT CIRCUMSTANCES

Beyond the fact that *Santana* does not apply because defendant did not leave the confines of her home or otherwise subject herself to public arrest, *Santana* is still

---

showed a conscious intention to protect the privacy of his home by utilizing only the small hole in the wall.

The dissent directs its attention to the factual differences between this case and *Flowers*, but it disregards the *Flowers* court's focus on the defendant's limited exposure of his hand outside the home in connection with his conscious intention to maintain his reasonable expectation of privacy, which is what we find most relevant to the instant discussion.

inapplicable because there was no hot pursuit or need for immediate police action. When officers have probable cause and exigent circumstances exist, it is reasonable under the Fourth Amendment for officers to enter a home without a warrant. *Payton*, 445 US at 590. Exigent circumstances exist when an emergency leaves law enforcement with insufficient time to obtain a warrant. *Michigan v Tyler*, 436 US 499, 509; 98 S Ct 1942; 56 L Ed 2d 486 (1978). "Hot pursuit" of a fleeing felon is one recognized example of exigent circumstances. *Santana*, 427 US at 42-43. Unlike the lower courts, we do not believe that there was a legitimate hot pursuit in this case.

To begin, application of the hot-pursuit doctrine under the instant circumstances is suspect. See *Welsh v Wisconsin*, 466 US 740, 750; 104 S Ct 2091; 80 L Ed 2d 732 (1984) ("Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor."). In fact, it is far from well settled that an officer with probable cause to arrest a suspect for a misdemeanor may rely on the hot-pursuit exception to make a warrantless home entry. *Stanton v Sims*, 571 US 3, 6, 10; 134 S Ct 3; 187 L Ed 2d 341 (2013) (recognizing that the federal circuits are sharply divided on whether a necessary component of the hot-pursuit doctrine is the pursuit of a fleeing *felon* and that its own precedent was "equivocal" on the matter).[10]

---

[10] Our Court of Appeals addressed this issue decades ago, opining that "the less serious nature of a misdemeanor offense militates against extending the hot pursuit exception to justify an unannounced entry into a private residence to make such an arrest." *People v Strelow*, 96 Mich App 182, 191; 292 NW2d 517 (1980).

However, even were we to characterize what occurred as a "pursuit," that pursuit would be far from a "hot" one. "What makes the pursuit 'hot' is 'the emergency nature of the situation,' requiring 'immediate police action.' " *Smith v Stoneburner*, 716 F3d 926, 931 (CA 6, 2013) (citation omitted). In *Santana*, immediate action was necessary both because police were pursuing a fleeing felon and because there was a reasonable fear that the defendant would destroy evidence if they did not act quickly. *Santana*, 427 US at 42-43. Here, defendant was suspected of a 90-day misdemeanor and there was no evidence of that crime that she could destroy. Indeed, all the elements of the crime were already known to the police. There is no suggestion that any emergency existed that would have entitled the police to enter defendant's home throughout the conversation up to the point when defendant reached out to retrieve her identification. We fail to see how defendant's interaction at the doorway created any kind of emergency, let alone one that would outweigh her expectation of privacy in her home.

The Court of Appeals held that, under *Santana*, the officer's pursuit of defendant was legitimate because he acted lawfully by attempting to grab her arm when she extended it beyond the threshold of her home. *Hammerlund*, unpub op at 6. As we have explained, critical to *Santana*'s holding was the fact that the defendant in that case was voluntarily in full public view when she first interacted with the police and before she retreated into her home. But, as previously discussed, defendant was not voluntarily exposed to public arrest at any point in the encounter. Therefore, unlike in *Santana*, when defendant pulled her arm away from the officer she did not thwart an "otherwise proper arrest" that had been "set in motion in a public place." *Santana*, 427 US at 42-43.

17

## C. *PAYTON*

Because *Santana* is inapplicable, we return to *Payton*, which prohibits entry into a suspect's home without a warrant in the absence of an emergency situation. *Payton*, 445 US at 590. Defendant did not expose herself to public arrest or relinquish her reasonable expectation of privacy throughout the encounter and there was no hot pursuit, but Officer Staman conceded that defendant's arrest was completed inside her home. Since the seizure occurred beyond the "firm line at the entrance of the house," it was unreasonable because it was accomplished without a warrant, without consent, and without any exigent circumstances. *Payton* prohibits it.[11]

## V. CONCLUSION

Officer Staman completed defendant's arrest inside her home, the place where the Constitution most protects her freedom from unreasonable governmental intrusion. Defendant was not subject to public arrest because she remained inside, she maintained her reasonable expectation of privacy, and her act of reaching out to retrieve her identification did not expose her to the public "as if she had been standing completely outside her house," *Santana*, 427 US at 42. In addition, the circumstances were insufficient to justify the hot-pursuit exception to the warrant requirement. Because the arrest was completed across the Fourth Amendment's "firm line at the entrance of the home," it was presumptively unreasonable. *Payton*, 445 US at 586, 590. It is the prosecution's burden to overcome this

---

[11] Although we disagree with the dissent that there was no evidence of coercion in this case, because defendant's arrest was completed in her home, we find it unnecessary to discuss or adopt the constructive-entry doctrine that defendant urges us to endorse. See *United States v Morgan*, 743 F2d 1158, 1166 (CA 6, 1984); *People v Gillam*, 479 Mich 253, 261-266; 734 NW2d 585 (2007).

presumption, *Oliver*, 417 Mich at 380, and when the government's interest is to arrest for a minor offense, the presumption that a warrantless entry into a home was unreasonable is difficult to rebut, *Welsh*, 466 US at 750. The prosecution failed to overcome this presumption, and the trial court and the Court of Appeals erred by concluding otherwise.

Accordingly, we reverse the Court of Appeals judgment and remand to the trial court for further proceedings. Whether suppression of evidence under the exclusionary rule is appropriate is an issue separate from whether defendant's Fourth Amendment rights were violated by police conduct. *People v Hawkins*, 468 Mich 488, 499; 668 NW2d 602 (2003). Because the trial court found no constitutional violation, it did not opine on the application of the exclusionary rule. We remand this case to the trial court to consider this issue.[12]

> Megan K. Cavanagh
> Bridget M. McCormack
> David F. Viviano
> Richard H. Bernstein
> Elizabeth T. Clement

---

[12] Amicus Curiae, the Prosecuting Attorneys Association of Michigan, urges this Court to conclude that the exclusionary rule must not apply here pursuant to its reading of *New York v Harris*, 495 US 14; 110 S Ct 1640; 109 L Ed 2d 13 (1990). Unlike the dissent, we believe that it would be imprudent to decide this issue given that neither the trial court nor the Court of Appeals addressed this argument, and we leave that issue to the parties to raise and the trial court to decide on remand. We note, however, that the prosecution acknowledged in its supplemental brief that defendant's admissions following her arrest may be inadmissible under *Harris*.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 156901

JENNIFER MARIE HAMMERLUND,

      Defendant-Appellant.

ZAHRA, J. (*dissenting*).

The majority holds that defendant's arrest violated the United States Constitution because defendant never left the sanctity of her home—or otherwise relinquished the reasonable expectation of privacy inherent to the home[1]—when Officer Erich Staman began the process of arresting her. I respectfully dissent. I conclude that *United States v Santana*[2] is on point and applicable to the instant case and not, as held by the majority, meaningfully distinguishable from the facts presented in this case. In my view, nothing about the probable cause underlying the arrest or its location rendered it constitutionally deficient. But even if the warrantless entry into defendant's home and subsequent arrest were improper under *Payton v New York*,[3] the established facts are sufficient to hold that

---

[1] See *Payton v New York*, 445 US 573, 585-586, 589-590; 100 S Ct 1371; 63 L Ed 2d 639 (1980).

[2] *United States v Santana*, 427 US 38; 96 S Ct 2406; 49 L Ed 2d 300 (1976).

[3] See *Payton*, 445 US at 585-586, 589-590.

exclusion of the evidence obtained after the arrest is not appropriate under *New York v Harris*.[4]  For these reasons, I would affirm defendant's convictions.[5]

## I.  NO MEANINGFUL DISTINCTION FROM *UNITED STATES v SANTANA*

The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

An arrest of a person, like all seizures (and searches), must therefore be reasonable to pass constitutional muster.[6]  Warrantless searches and seizures that occur within a defendant's

---

[4] *New York v Harris*, 495 US 14; 110 S Ct 1640; 109 L Ed 2d 13 (1990).

[5] This Court, in its May 30, 2018 order, required the parties to prepare supplemental briefs addressing a single issue: "whether it is constitutionally permissible for a police officer to compel, coerce, or otherwise entice a person located in his or her home to enter a public place to perform a warrantless arrest."  *People v Hammerlund*, 501 Mich 1086, 1087 (2018).  The majority does not address this question now because it has determined that defendant never left her home or otherwise relinquished her reasonable expectation of privacy prior to her arrest.  Although I disagree with the majority's reasoning, I would also decline to address this issue because—having reviewed the record—I have found no evidence of coercion in this case.

Given that neither I nor the majority believes that the question posed to the parties in this Court's May 30, 2018 order is pertinent to these proceedings, the best course of action is to either deny defendant's application for leave or direct the parties to devote further briefing to the issues the majority now deems to be dispositive.  For the reasons expressed in this dissent, I believe that the majority's chosen course of action is imprudent and legally incorrect.

[6] *Payton*, 445 US at 585.

home are *presumptively* unreasonable.[7]  Indeed, " 'physical entry of the home is the chief

evil against which the wording of the Fourth Amendment is directed.' "[8]  As the United

States Supreme Court stated in *Payton v New York*:

> The Fourth Amendment protects the individual's privacy in a variety of
> settings.  In none is the zone of privacy more clearly defined than when
> bounded by the unambiguous physical dimensions of an individual's home—
> a zone that finds its roots in clear and specific constitutional terms: "The right
> of the people to be secure in their . . . houses . . . shall not be violated."  That
> language unequivocally establishes the proposition that "[a]t the very core
> [of the Fourth Amendment] stands the right of a man to retreat into his own
> home and there be free from unreasonable governmental intrusion."  In terms
> that apply equally to seizures of property and to seizures of persons, the
> Fourth Amendment has drawn a firm line at the entrance to the house.
> Absent exigent circumstances, that threshold may not reasonably be crossed
> without a warrant.[9]

On the other hand, arrests made in public places are not afforded nearly the same

level of protection under the Fourth Amendment.[10]  Rather, in public settings, a police

officer does not typically violate the Fourth Amendment by performing a warrantless arrest

as long as it is supported by probable cause.[11]  Critically, under the United States Supreme

Court's decision in *United States v Santana*, the doorway of one's residence is considered

---

[7] *Id*. at 586.

[8] *Id*. at 585-586, quoting *United States v United States Dist Court for the Eastern Dist of Mich*, 407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972).

[9] *Payton*, 445 US at 589-590 (citation omitted).

[10] See *Santana*, 427 US at 42.

[11] *Id*.

a public space for purposes of Fourth Amendment analyses.[12]  That is, a defendant does not have an "expectation of privacy" in the threshold separating the interior of his or her home from the outside world.[13]

In *Santana*, the police went to the defendant's house on the basis of information that she was in possession of marked money used to make a controlled purchase of heroin by an undercover agent.[14]  Testimony established that, when the officers arrived, the defendant was "standing directly in the doorway[;] one step forward would have put her outside, one step backward would have put her in the vestibule of her residence."[15]  The officers displayed identification and shouted "police," prompting the defendant to retreat into the vestibule of the house.[16]  As she did, the defendant spilled two bundles of paper packets containing a white powder, later determined to be heroin.[17]  The police followed the defendant into her home, restrained her, and asked her to empty her pockets.[18]  The defendant produced $70 of marked money.[19]  The defendant was charged with distribution

---

[12] *Id*. at 40, 42.

[13] *Id*. at 42.

[14] *Id*. at 39-40.

[15] *Id*. at 40 n 1.

[16] *Id*. at 40.

[17] *Id*. at 40-41.

[18] *Id*.

[19] *Id*. at 41.

4

of heroin, and she moved to suppress evidence recovered at the scene.[20]  The Supreme Court of the United States determined that suppression was inappropriate because the arrest was "set in motion in a public place . . . ."[21]  That is, the defendant was in a public place—the threshold of her home, where she had no reasonable expectation of privacy—when the police, armed with probable cause, sought to arrest her.[22]  The defendant could not avoid an otherwise proper arrest by retreating into her home because law enforcement officers armed with probable cause for an arrest are within constitutional bounds to engage in a "hot pursuit" of a fleeing felon, even if that pursuit requires intrusion into the home.[23]  The Supreme Court observed that "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house."[24]

In the present case, the majority makes much of the fact that defendant began her encounter with Officer Staman from a position within the interior of her home.  But this factual distinction from *Santana*[25] is without legal significance.  What mattered in *Santana*

---

[20] *Id*.

[21] *Id*. at 43.

[22] *Id*. at 42.

[23] *Id*. at 42-43.  As the Supreme Court noted, the "hot pursuit" exception to the warrant requirement is a form of the exigent-circumstances exception. *Id*. & 43 n 3, citing *Warden, Maryland Penitentiary v Hayden*, 387 US 294, 298; 87 S Ct 1642; 18 L Ed 2d 782 (1967).

[24] *Santana*, 427 US at 43.

[25] See *id*. at 40.

was that the arrest was *initiated* from a lawful point in a public place.[26]  I would hold that Officer Staman complied with this aspect of *Santana* by initiating the arrest only after defendant voluntarily reached across the threshold of her home to retrieve her identification.[27]

The majority suggests that the record is unclear regarding how much of defendant's arm or body was on either side of the imaginary line dividing the protected area within the interior of the home and the unprotected public space outside.  While defendant's exact position at the time the arrest was initiated has not been established with pinpoint accuracy, the uncontroverted record evidence shows that Officer Staman did not reach across the threshold of the house *at all* when defendant attempted to retake her identification.  At the evidentiary hearing following defendant's motion to suppress,[28] Officer Staman testified,

---

[26] See *id*. at 42.

[27] Contrary to the majority's assertion, the conduct of other police officers prior to defendant's interaction with Officer Staman does nothing to affect this analysis.  Defendant testified at trial that the officers who came to her door *before* Officer Staman's arrival threatened her and her roommate with arrest if defendant did not get out of bed and come to her door.  Putting aside that this testimony is arguably inadmissible hearsay relating to the statements of her roommate and of the police officers—all of whom never testified during these proceedings—the officers' actions have no bearing on whether defendant maintained a reasonable expectation of privacy when she voluntarily reached across her threshold during her subsequent interaction with Officer Staman.  Although I am troubled by defendant's testimony pertaining to the conduct of the officers who preceded Officer Staman, her position inside the home before she spoke with Officer Staman does not invalidate the conclusion that, at the time of her arrest, defendant was "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." See *id*.

[28] Because the parties harbored some disagreement as to the pertinent facts at the initial suppression hearing, the trial court allowed for an evidentiary hearing to establish the relevant facts of the case.

6

"I don't think my hand was ever inside the house when I handed [defendant] the I.D."[29] Rather, he only entered the house when he took hold of defendant and was pulled inside while attempting to complete the arrest. *Some part* of defendant's person, at the very least up to her wrist, had extended beyond the constitutionally protected bounds of her home; and from the record, it appears that there is no evidence that Officer Staman took hold of any part of defendant's person that remained inside the house at the moment when he initiated the arrest.

On this record, I disagree with the majority's assertion that defendant had a reasonable expectation of privacy at the time of the arrest.[30] In *Katz v United States*, the Supreme Court of the United States held that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[31] I discern no principled reason why the act of appearing at the doorway and *reaching outside*

---

[29] I cannot conclude that the record lacks clarity merely because Officer Staman testified that he did not "think [his] hand was ever inside the house when [he] handed [defendant] the I.D." Taken at face value, the testimony establishes that Officer Staman believed he initiated the arrest while defendant extended some part of her body outside. To the extent the phrase "I don't think" may be viewed as qualifying Officer Staman's testimony, the absence of any contradictory evidence looms large. Simply stated, Officer Staman's testimony is uncontroverted.

[30] I take further issue with the practical application of the majority's holding. If future arrests are initiated near the threshold of a defendant's home, is the defendant—who maintains a single foot inside the interior of the home—free from warrantless arrest simply because they "manifest[] an intent to stay inside, and [law enforcement is] aware of that intention"? Regardless, even if defendant subjectively intended to maintain a reasonable expectation of privacy while standing away from the door at the beginning of her interaction with Officer Staman, this expectation could not remain reasonable when she moved forward and voluntarily reached across the threshold of her home.

[31] *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967).

is not properly characterized as "knowingly expos[ing oneself] to the public." Several federal circuit courts agree. Consider *Sparing v Village of Olympia Fields*,[32] the case cited by the majority for the proposition that "an attempt to determine how far defendant extended her arm or hand over the threshold and what that might mean is an unnecessary exercise." In that case, the United States Court of Appeals for the Seventh Circuit explained a "doorway arrest" as follows:

> But what if the individual is not voluntarily standing *in* an open doorway, but answers a knock at the door, standing by a "fraction of an inch" behind an open doorway? We still apply *Santana*-type "public view, speech, hearing, and touch" analysis to aid in the determination of whether a reasonable expectation of privacy exists . . . .
>
> . . . [W]hen an individual voluntarily stands behind an open doorway—fractions of an inch "inside the home"—ordinarily, for purposes of the Fourth Amendment, she stands outside, in a public place.[33]

*Sparing* is not the only federal circuit case to hold that a person standing entirely inside the home by a small amount is in a "public place" for the purposes of the Fourth Amendment (and thus potentially subject to warrantless arrest). In *United States v Vaneaton*, the issue was whether "the police, acting with probable cause but without a warrant and while standing outside [the defendant's] motel room, could lawfully arrest [the defendant] while he was standing immediately inside the open doorway."[34] The United States Court of Appeals for the Ninth Circuit concluded that the arrest was lawful, reasoning that the

---

[32] *Sparing v Village of Olympia Fields*, 266 F3d 684 (CA 7, 2001).

[33] *Id*. at 689.

[34] *United States v Vaneaton*, 49 F3d 1423, 1425 (CA 9, 1995).

defendant "exposed himself in a public place" because "he voluntarily opened the door and exposed both himself and the immediate area to them."[35]  Similarly, in *United States v Council*, the United States Court of Appeals for the Eighth Circuit concluded that a warrantless arrest was lawful where the defendant was arrested "at the doorway of his camper."[36]  The court explained that the precise placement of the defendant in relation to the doorway was not dispositive:

> Lest we become too preoccupied with the exact location of the individual in relation to the doorway, we make clear our general conclusion that [the defendant] forfeited any reasonable expectation of privacy during the exchange.  When [the defendant] appeared at his doorway, he was not merely visible to the public, but was as exposed to public view, speech, hearing, and touch as if he had been standing completely outside his house.[37]

These courts properly applied the principles set forth in *Katz* and *Santana*.[38]

---

[35] *Id*. at 1427.

[36] *United States v Council*, 860 F3d 604, 606-607 (CA 8, 2017).

[37] *Id*. at 610-611 (quotation marks, citations, and brackets omitted).

[38] The majority's reliance on the decision of the United States Court of Appeals for the Tenth Circuit in *United States v Flowers*, 336 F3d 1222 (CA 10, 2003), is misplaced.  In that case, the police learned that the defendant was selling alcohol (among other things) illegally from his home.  *Id*. at 1223.  Although the defendant was not initially aware that he was speaking to police, he interacted with them from behind a closed door.  *Id*. at 1224.  When the police requested that the defendant sell them wine, the defendant opened a panel adjacent to the door with a bottle of wine in hand and stated that the purchase would cost $3.00.  *Id*.  At that point, the police made themselves known and requested entry into the defendant's home.  *Id*.  The defendant obliged, and the police arrested him once inside the home.  *Id*.  The Tenth Circuit held that, absent exigent circumstances, the arrest violated the Fourth Amendment, stating:

> Although [the defendant] put his arm and hand outside his house by extending them through the panel opening, the rest of his body did not cross his threshold . . . .  [The defendant] did not lose "the constitutional protection

The *Santana* Court reasoned that the defendant was in a public place when she stood in the threshold of her home because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house."[39] So, too, was defendant in this case "exposed to public view, speech, hearing, and," clearly, "touch" as if no part of her was occupying the space within her home at the time of her arrest.[40] Officer Staman testified at trial that, during his initial interaction with defendant, "it was still dark, but you could see who [he] was talking to inside the house without any difficulty." No door or barrier impeded defendant's ability to speak to Officer Staman from a point initially between 10 and 20 feet within her home or her ability to reach across the threshold in an attempt to retake her identification, nor did any such barrier prevent Officer Staman from taking hold of some portion of defendant's hand or wrist without crossing the threshold himself. When Officer Staman initiated the arrest by taking hold of the part of defendant that crossed her threshold, it was of no consequence that some other portion of her body remained within the protected area of the home's

afforded to the individual's interest in the privacy of his own home . . . ." [*Id.* at 1227, quoting *Payton*, 445 US at 588.]

While the majority cites *Flowers* for its acknowledgment of the defendant's "conscious intention to maintain his reasonable expectation of privacy," that case is easily distinguishable because the defendant cannot be said to have been "exposed to public view, speech, hearing, and touch as if []he had been standing completely outside h[is] house" when he reached his arm through a panel next to an adjacent *but closed* front door. See *Santana*, 427 US at 42. As discussed, the circumstances involved in this case are quite different.

[39] *Id.*, citing *Hester v United States*, 265 US 57, 59; 44 S Ct 445; 68 L Ed 898 (1924).

[40] See *Santana*, 427 US at 42.

interior. As was the case in *Santana*, the circumstances surrounding the arrest reveal that defendant's expectation of privacy was diminished to a point "as if she had been standing completely outside her house."[41]

## II. PROBABLE CAUSE TO ARREST DEFENDANT

Having determined that the *Santana* holding is applicable under these facts, it is still necessary to determine whether Officer Staman had probable cause to arrest defendant[42] and whether a "hot pursuit" justified Officer Staman's entry into the home after initiating the arrest. I would hold that Officer Staman had probable cause sufficient to execute a public arrest and that—regardless of the relatively fleeting "pursuit" leading into defendant's home—Officer Staman's entry after beginning the arrest was lawful.

As the majority articulates, "[p]robable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[43] In this case, by the time Officer Staman attempted to perform the arrest at issue, he had already discovered an abandoned car registered to defendant bearing indication that it had been the cause of damage to public road fixtures. After Officer Staman arrived at defendant's residence, defendant made

---

[41] See *id.*

[42] See *id.*

[43] *People v Champion*, 452 Mich 92, 115; 549 NW2d 849 (1996). See also *Devenpeck v Alford*, 543 US 146, 152; 125 S Ct 588; 160 L Ed 2d 537 (2004), citing *Maryland v Pringle*, 540 US 366, 371; 124 S Ct 795; 157 L Ed 2d 769 (2003).

11

noncustodial prearrest statements that she was driving and that she had left the scene of the accident without reporting the damage. Probable cause was therefore clearly established as to defendant's involvement in failing to report an accident causing damage to fixtures.[44]

MCL 764.15 outlines several state-specific rules for conducting warrantless arrests. Under that statute, a police officer may conduct a warrantless arrest for any felony, misdemeanor, or ordinance violation committed in that officer's presence.[45] Felonies can form the basis for a valid warrantless arrest under MCL 764.15(1)(b) even when not committed in the officer's presence; but *misdemeanors* that are not committed in the officer's presence can only form the basis for a warrantless arrest under MCL 764.15(1)(d) when they are punishable by imprisonment for more than 92 days and when the arresting officer has "reasonable cause" to believe the person being arrested committed the misdemeanor. Here, Officer Staman went to defendant's home to investigate a suspected failure to report an accident causing damage to fixtures in violation of MCL 257.621, although the crime was not committed in his presence. Failure to report an accident causing damage to fixtures is only a 90-day misdemeanor.[46] Accordingly, it does not meet the criteria for a valid warrantless arrest under MCL 764.15(1)(d). The arrest at issue therefore constituted a *statutory* violation.

Nevertheless, as this Court stated in *People v Hawkins*:

---

[44] See MCL 257.621.

[45] MCL 764.15(1)(a).

[46] MCL 257.621(a); MCL 257.901(1) and (2).

12

Irrespective of the application of the exclusionary rule in the context of a *constitutional* violation, the drastic remedy of exclusion of evidence does not necessarily apply to a *statutory* violation. Whether the exclusionary rule should be applied to evidence seized in violation of a statute is purely a matter of legislative intent.[47]

That is, "where there is no determination that a statutory violation constitutes an error of constitutional dimensions, application of the exclusionary rule is inappropriate unless the plain language of the statute indicates a legislative intent that the rule be applied."[48] Nothing in the text of MCL 764.15 indicates that violations of the statute warrant application of the exclusionary rule. Thus, exclusion of evidence on the basis of violations of that statute is appropriate only if such violations establish "error of constitutional dimensions."[49] The majority appears to acknowledge as much in a footnote.[50]

Putting aside, for the moment, probable cause to arrest defendant for failure to report an accident causing damage to fixtures, precedent from the Supreme Court of the United States provides:

> [A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. [T]he Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances,

---

[47] *People v Hawkins*, 468 Mich 488, 500; 668 NW2d 602 (2003).

[48] *Id.* at 507.

[49] *Id.*

[50] See note 4 of the majority opinion.

*whatever* the subjective intent. [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.[51]

Regardless of the propriety of an arrest for defendant's failure to report an accident causing damage to fixtures, Officer Staman *also* had probable cause to initiate an arrest for operating a vehicle under the influence of intoxicating liquor, third offense, in violation of MCL 257.625(9)(c). The felony information and affidavit of probable cause in the record state that defendant had been convicted of operating while intoxicated twice in the past— once in 1998 and once in 2006.[52] Officer Staman testified at the evidentiary hearing that

---

[51] *Devenpeck*, 543 US at 153 (quotation marks and citations omitted). See also *United States v Anderson*, 923 F2d 450, 457 (CA 6, 1991) ("[K]nowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants.").

[52] The majority suggests that defendant's prior two convictions cannot be relevant to the probable cause supporting the arrest because the record is unclear as to whether Officer Staman was actually aware of the convictions at the time of the arrest. See note 5 of the majority opinion. As a preliminary matter, Officer Staman may well have been aware of those convictions, having testified at the evidentiary hearing that, in order to determine the registered owner of the vehicle at the scene of the accident, he had to consult secretary of state records. See MCL 257.625(21)(a) (prior convictions for operating under the influence under MCL 257.625(1) are reported to the secretary of state).

Regardless, the majority's interpretation of *Devenpeck* ignores language from the Supreme Court's opinion stating that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the *known* facts provide probable cause," and "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken *as long as the circumstances, viewed objectively, justify that action.*" See *Devenpeck*, 543 US at 153 (emphasis added; quotation marks omitted). This language is consistent with the Supreme Court's guidance in *Herring v United States*, which explained that exclusion is a tool of " 'last resort, not [of] first impulse . . . .' " *Herring v United States*, 555 US 135, 140; 129 S Ct 695; 172 L Ed 2d 496 (2009), quoting *Hudson v Michigan*, 547 US 586, 591; 126 S Ct 2159; 165 L Ed 2d 56 (2006). That is, the exclusionary rule is properly applied only where it results in "appreciable deterrence" of future Fourth Amendment violations. *Herring*, 555 US at 141 (quotation marks and

14

when he was dispatched to the scene of the accident, he found defendant's vehicle abandoned, facing the wrong direction on an exit ramp from US-131, and showing signs that it had struck both of the protective barriers on the exit ramp. Defendant, herself, did not report the accident to the police. After Officer Staman arrived at defendant's home, he observed defendant leaning against a wall as if to maintain balance. He also noticed that her speech was slurred prior to transporting her to the police station.[53] A violation of MCL

citation omitted). Even when exclusion may facilitate some marginal degree of such deterrence, exclusion is not appropriate if the cost of applying the rule—"letting guilty and possibly dangerous defendants go free"—outweighs the potential benefit. *Id*. "[T]he rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." *Pennsylvania Bd of Probation & Parole v Scott*, 524 US 357, 364-365; 118 S Ct 2014; 141 L Ed 2d 344 (1998). Moreover, the *Herring* Court explained, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Herring*, 555 US at 143. "[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that' " his or her conduct violated the Fourth Amendment. *Illinois v Krull*, 480 US 340, 348-349; 107 S Ct 1160; 94 L Ed 2d 364 (1987), quoting *United States v Peltier*, 422 US 531, 542; 95 S Ct 2313; 45 L Ed 2d 374 (1975).

Here, the record reveals no evidence that Officer Staman believed this arrest to be unlawful before proceeding in spite of such awareness. Indeed, from his testimony at the evidentiary hearing, it seems clear that—notwithstanding the probable cause or lack thereof pertaining to the offense of operating a motor vehicle under the influence of intoxicating liquor—Officer Staman believed that he was arresting defendant for a 93-day misdemeanor in compliance with MCL 764.15(1)(d). There is no flagrant or culpable conduct on the part of the police to deter in future cases. The circumstances existing at the time of the arrest were sufficient to establish probable cause, and Officer Staman's failure to recognize that he was able to arrest defendant for operating a vehicle while under the influence of intoxicating liquor should not be punished by implementation of the exclusionary rule.

[53] The majority believes that "more concrete facts"—aside from the nature of defendant's accident, the fact that defendant abandoned her crashed vehicle without contacting the police, defendant's use of a wall in a manner suggesting that she needed it to maintain balance, and defendant's slurred speech—are necessary to establish probable cause to believe that defendant was under the influence of intoxicating alcohol when the accident

257.625(9)(c) would constitute a felony. Thus, Officer Staman was statutorily authorized under MCL 764.15(1)(b) and (h) to arrest defendant, notwithstanding his mistaken belief that failure to report an accident to fixtures was a 93-day misdemeanor.

## III. HOT PURSUIT

Moving forward, it becomes necessary to determine whether the arrest was improper under Fourth Amendment jurisprudence because it was completed *inside* defendant's home, even though Officer Staman initially took hold of defendant when she voluntarily extended her hand into a public space to retrieve her identification. The Court of Appeals accurately alluded to the holding in *Santana*, stating that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."[54] As noted by the majority, there appears to be a divide in the

---

occurred. To be certain, one can imagine a scenario in which defendant imbibed alcoholic beverages only after returning home. The majority entertains such scenarios by speculating that defendant's slurred speech and unstable stance were due to the accident. But the United States Supreme Court instructs us that "[p]robable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v United States*, 571 US 320, 338; 134 S Ct 1090; 188 L Ed 2d 46 (2014), quoting *Florida v Harris*, 568 US 237, 244; 133 S Ct 1050; 185 L Ed 2d 61 (2013) (quotation marks, citation, and brackets omitted). On the information available to Officer Staman and the circumstances present at the time of the arrest, it was reasonable for him to conclude that defendant had been under the influence of intoxicating liquor at the time of her accident, particularly in light of her failure to report the accident to the police. This remains true regardless of other possible explanations for defendant's demeanor and her inexplicable failure to report her accident—an accident in which she collided with multiple protective barriers and left her damaged vehicle near the roadway facing the wrong direction. Given these facts, this arrest was not the product of a violation of the Fourth Amendment, but rather the result of sound investigatory police work.

[54] See *Santana*, 427 US at 43.

federal courts as to whether the "hot pursuit" exception applies to warrantless entry into the home of a fleeing defendant suspected of committing a *misdemeanor*.[55]  Indeed, our Court of Appeals has previously held that the "hot pursuit" exception to the warrant requirement did not allow for entry into the home of a defendant suspected of committing a misdemeanor.[56]

In any event, this Court need not take a stance on this issue in the present case.  As previously stated, Officer Staman would have had probable cause to believe that defendant operated a vehicle under the influence of intoxicating liquor—a felony where, as here, it is a defendant's third such offense[57]—before the arrest.  Where Officer Staman had probable cause to believe that such a violation occurred, the "hot pursuit" exception would undoubtedly apply.[58]  Accordingly, when Officer Staman took hold of defendant in a public place and defendant began to resist and pull away, Officer Staman could lawfully pursue defendant into her home to prevent her escape.[59]  As stated by the Supreme Court in

---

[55] See *Stanton v Sims*, 571 US 3, 6; 134 S Ct 3; 187 L Ed 2d 341 (2013).

[56] *People v Strelow*, 96 Mich App 182, 191; 292 NW2d 517 (1980).

[57] See MCL 257.625(9)(c).

[58] See *Devenpeck*, 543 US at 153.

[59] See *Santana*, 427 US at 43.  The majority suggests that Officer Staman could not rely on the "hot pursuit" exception to the warrant requirement partly because there was no evidence that defendant could destroy; although it is worth noting that evidence in the form of defendant's measurable blood alcohol level would dissipate over time.  Regardless, preventing the destruction of evidence is only *one* consideration in an analysis of exigent circumstances.  See *Minnesota v Olson*, 495 US 91, 100; 110 S Ct 1684; 109 L Ed 2d 85 (1990).  In *Olson*, the United States Supreme Court stated:

*Santana*, "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into [defendant's] house."[60]

The arrest in this case was supported by probable cause, initiated in a public place in accordance with *Santana*, and properly completed inside defendant's home pursuant to the "hot pursuit" exception to the warrant requirement.

---

The Minnesota Supreme Court applied essentially the correct standard in determining whether exigent circumstances existed. The court observed that "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, *or* imminent destruction of evidence . . . , *or* the need to prevent a suspect's escape, *or* the risk of danger to the police or to other persons inside or outside the dwelling." [*Id*., quoting *State v Olson*, 436 NW2d 92, 97 (Minn, 1989) (emphasis added; citation omitted).]

Thus, while the arrest may not have been valid solely on the basis of an attempt to preserve evidence, entry into defendant's home was necessary to prevent the circumvention of a constitutionally proper arrest, which was initiated from a position outside the protected area inside the home.

[60] *Santana*, 427 US at 43. I am cognizant of the rule that police cannot create the exigent circumstances relied on in entering a defendant's home. See *Kentucky v King*, 563 US 452, 462; 131 S Ct 1849; 179 L Ed 2d 865 (2011). Even so, that rule merely bars application of the exigent-circumstances exception—including pursuit of a fleeing felon—where the police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment . . . ." *Id*. As previously alluded to, the record does not support the notion that Staman ever engaged in or threatened to engage in conduct that would violate the Fourth Amendment. Rather, defendant voluntarily reached across her threshold to take back her identification after it was offered to her. There was no indication presented in the lower court proceedings that defendant was improperly coerced into leaving the sanctity of her home on the basis of some show of authority or threat that removed the element of choice. The majority disagrees, see note 11 of the majority opinion, but it fails to cite any part of the record in support of its position.

## IV. APPLICATION OF *NEW YORK v HARRIS*

But even if the "hot pursuit" exception does not apply, defendant still would not be entitled to suppression of the evidence. Defendant is denied the relief she seeks by the United States Supreme Court's opinion in *New York v Harris*,[61] a case referred to by the majority in a single footnote. The majority remands the case to the trial court but does not decide this issue, noting that neither the trial court nor the Court of Appeals addressed the application of the exclusionary rule. Because the facts of the case have been sufficiently developed such that we *could* apply the holding in *Harris*, I believe that we should do so in the name of judicial efficiency.

In *Harris*, the United States Supreme Court explained that "the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime."[62] That is, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*," as long as the statement is not rendered inadmissible on some other grounds, e.g., coercion.[63] It seems clear, then, that because Officer Staman had probable cause to arrest defendant for failure to report an accident causing damage to fixtures and for operating a motor vehicle under the influence

---

[61] See *Harris*, 495 US at 17.

[62] *Id*.

[63] *Id*. at 20-21.

of intoxicating liquor, defendant's statements in Officer Staman's police cruiser—made after waiving her *Miranda* rights—would be admissible even if the arrest inside defendant's home violated the rule in *Payton*.[64]  I see no reason why the rule in *Harris* would not extend to uphold the admissibility of defendant's blood-alcohol-level tests as well.

## V.  CONCLUSION

I would hold that there was no constitutional defect in the probable cause supporting the arrest and no constitutional defect stemming from the location of the arrest.  Even if a constitutional error did occur when Officer Staman entered the home to complete the arrest, the United States Supreme Court's holding in *Harris*[65] instructs that the exclusionary rule would not serve to bar admission of defendant's self-incriminating statements made in Officer Staman's police vehicle or to the blood-alcohol-level tests administered in this case. For these reasons, I believe the lower courts ultimately reached the correct conclusion.  I would affirm defendant's convictions.

Brian K. Zahra
Stephen J. Markman

---

[64] See *id.*

[65] See *id.*

20